IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE: * | |
| MORNINGSTAR MARKETPLACE, LTD, * | CHAPTER 11 |
|     Debtor * | |
| * | CASE NO. 1:14-bk-00451 MDF |
| MANUFACTURERS AND TRADERS * | |
| TRUST CO., as Trustee, * | |
|     Movant * | |
| * | |
| v. * | |
| * | |
| MORNINGSTAR MARKETPLACE, LTD., * | |
|     Respondent * | |

## OPINION

Before me is the motion filed by Manufacturers and Traders Trust Company ("M&T"), as the trustee under a trust indenture for holders of the York County Industrial Development Authority Mortgage Revenue Bonds Series 2010, for the appointment of a Chapter 11 trustee in the within case. For the reasons set forth below, M&T's motion will be granted.[1]

### I. Procedural History

Morningstar Marketplace, Ltd. ("Debtor"), a Pennsylvania limited partnership, filed its petition under Chapter 11 of the Bankruptcy Code on February 3, 2014. Debtor has continued to operate as a debtor-in-possession since it filed its petition. The resolution authorizing the bankruptcy filing was signed by Debtor's general partner, Andrew W. Lentz ("Lentz"), who holds an 81% interest in the limited partnership. Debtor's sole business is holding title to real property located at 5309 Lincoln Highway, Thomasville, York County, Pennsylvania (the

---

[1] I have jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core, non-*Stern* proceeding pursuant to 28 U.S.C. § 157(b)(2)(A). This Opinion constitutes findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052, which is applicable to contested matters pursuant to Fed. R. Bank. P. 9014.

"Property"), which Debtor valued on its schedules at $3.6 million. The Property is used for the operation of a flea market by a related entity, Morningstar Marketplace, Inc., ("MMI") and for the operation of a solar farm by another related entity, Morningstar Solar LLC ("Solar") (collectively, the "Related Entities"). Lentz owns a controlling interest in both MMI and Solar. Debtor has entered into written lease agreements with both MMI and Solar, and substantially all of Debtor's income is derived from rent paid by MMI. In turn, virtually all of MMI's income comes from rents paid by vendors who lease spaces at the market.

Debtor's primary secured creditors are PNC Bank, N.A. ("PNC") and M&T. PNC holds a mortgage that secures a term loan dated February 28, 2006, which had a balance due of $2,629,692.97 on the date of the petition. MMI guaranteed Debtor's obligation under the PNC note.

M&T holds a second mortgage on the Property. The debt to M&T arose from a $3.4 million loan made to Debtor by the York County Development Authority (the "Authority") for the construction of a solar energy project. To fund the loan, the Authority issued $3.4 million in mortgage revenue bonds and appointed M&T as trustee for the bondholders. Debtor assigned all leases and income generated by the Property to the Authority, and, in turn, the Authority assigned its rights under the note and mortgage to M&T. On the date of the petition, the outstanding debt owed to M&T was $3,603,005.03. Based upon documentation included in the M&T proof of claim, Debtor and the Related Entities signed the note to the Authority that is secured by the second mortgage.

Soon after the Chapter 11 case was commenced, M&T filed motion requesting that Debtor be prohibited from using cash collateral. In response to the motion, Debtor and M&T

2

entered into negotiations for Debtor's continued use of cash collateral. In the first interim order entered on April 17, 2014 ("First Interim Order"), Debtor and M&T stipulated that Debtor would be unable "to continue to operate in Chapter 11, market and sell its assets, or maximize the value of its assets" without the use of cash collateral. (Doc. 58, ¶ A)

On April 21, 2014, after consultation with M&T, Debtor filed an application to retain K/W Commercial/Keller Williams of Central PA East ("Keller Williams") as a real estate broker to market the Property and the assets of Solar and MMI as a going concern. The one-year listing agreement attached to the application stated that the asking price for Debtor's assets and the assets of the Related Entities was $5.2 million. The Application was approved on April 29, 2014.

On May 16, 2014, a "Final Stipulated Order" (the "May 16 Order") authorizing the use of cash collateral was entered, which required regular monthly payments on PNC's debt and adequate protection payments of $1500 a month to M&T unless income was insufficient to make payments to PNC. Under the terms of the May 16 Order, the occurrence or non-occurrence of various events would trigger immediate termination of the use of cash collateral, including the requirement that Debtor file a motion by August 4, 2014 for approval of bidding procedures and that a sale of Debtor's assets be approved by October 30, 2014.

On August 26, 2014, the May 16 Order became final. Two days later, the parties filed a "First Amended Final Stipulated Order" again modifying terms for the use of cash collateral and extending the sale date. On February 3, 2015, a "Second Amended Final Stipulated Order" was entered changing the adequate protection payments to M&T and again extending the deadlines for filing a motion for the approval of bidding procedures and for consummating a sale of Debtor's assets.

After the listing agreement with Keller Williams terminated in March 2015, no offers for the Property having been received, Debtor filed an application to employ Rock Commercial Real Estate LLC ("Rock") to list the Property and the assets of the Related Entities at the asking price of $5.2 million. Approval of Rock's retention was granted on May 27, 2015. The orders approving the retention of both real estate brokers specifically provided that any sale of the Property and the assets of the Related Entities was subject to the consent of PNC and M&T.

On June 2, 2015 a "Third Amended Final Stipulated Order" (the "June 2 Order") was entered. The June 2 Order required Debtor to make adequate protection payments of $11,700 per month to M&T for the period June 2015 through September 2015. Debtor also agreed to file a motion by September 11, 2015 for approval of bidding procedures for the sale of substantially all of Debtor's assets, acceptable to PNC and M&T, or the authority to use cash collateral would terminate without further notice or hearing. A final hearing on the continued use of cash collateral was set for September 29, 2015.

When it was unable to meet the deadline of September 11 for filing a motion to approve bidding procedures, Debtor filed a motion to modify the use of cash collateral arguing that by paying the PNC mortgage, Debtor was providing adequate protection to M&T's interest. In response, M&T filed the within motion seeking termination of the automatic stay, appointment of a Chapter 11 trustee, or other relief. A hearing was held on Debtor's motion to modify the use of cash collateral and the within motion on September 30, and an evidentiary hearing was scheduled for October 15, 2015. The hearing was not held on October 15, and the June 2 Order was extended through October 31, 2015.

4

On November 6, 2015, I signed the "Fourth Amended Final Stipulated Order" (the "November 6 Order"), which authorized Debtor to use cash collateral until March 31, 2016 subject to certain contingencies. The November 6 Order authorized Debtor to use cash collateral for two months subject to an agreed to budget, but required that Debtor obtain budget approval from PNC and M&T for the remainder of the period. The most significant change from the prior cash collateral orders was the requirement that a property manager for both Debtor and MMI be retained. The November 6 Order specified the priority for the payment of expenses by the property manager,[2] requiring that real property taxes have the first priority followed by payment to PNC. After these obligations were paid, certain adequate protection payments were to be made to M&T followed by the payment of operating expenses. To offset the cost of the property manager, Lentz was to reduce his salary from $100,000 "in an amount necessary to compensate for the cost of the property manager or other method of verifying and collecting rents as agreed to by the parties." (Doc. 231, ¶ 4) Use of cash collateral would be terminated if real property taxes were not paid timely. As in the prior stipulated cash collateral orders, the November 6 Order required Debtor to take prompt steps to obtain approval of the sale of Debtor's assets. M&T reserved its right to pursue termination of the automatic stay, appointment of a Chapter 11 trustee, and other relief, and a hearing was scheduled for December 16, 2015 on all outstanding matters.

At the December 16 hearing, an evidentiary hearing was scheduled for December 22 on M&T's motion to appoint a trustee, but after a phone conference on December 18, 2015, the

---

[2]On November 24, 2015, Sherman Property Management was appointed property manager retroactive to November 6, 2015.

evidentiary hearing was continued to January 5, 2016. During the December 18 phone conference, the parties agreed that Debtor had not complied with the court-ordered requirements for the use of cash collateral and that its authority to use cash collateral had been terminated. In the order continuing the hearing, Lentz was directed to surrender signatory authority over all Debtor's accounts and agreed to surrender authority over the accounts of MMI and Solar to the property manager as well as surrender any debit cards associated with the accounts. I reserved a decision on whether to require Lentz and Debtor's professionals to disgorge funds paid to professionals and Lentz in violation of earlier cash collateral orders.

In mid-December, Debtor filed a motion requesting the approval of bidding procedures for the sale of Debtor's assets without obtaining the concurrence of PNC or M&T. Before the bid procedures were approved, Debtor filed a motion to sell Debtor's assets to a proposed purchaser based upon a letter of intent to purchase the assets for $2.8 million. At the time the sale motion was filed, Rock had been marketing the Property for $4.2 million, reduced from the initial price of $5.2 million. The letter of intent proposed that the Property and the assets of the Related Entities would be purchased for $200,000 in cash and the assignment of the PNC mortgage. Under the terms of the proposed sale no funds would be disbursed to M&T. Both PNC and M&T filed objections to the proposed sale.

An evidentiary hearing was held on January 5, 2015, at which time M&T indicated that it was pursuing an order directing the United States to appoint a Chapter 11 trustee, but was not seeking relief from the automatic stay or a determination as to whether Debtor was a single asset real estate case subject to 11 U.S.C. § 362(d)(3).

Case 1:14-bk-00451-MDF    Doc 311    Filed 01/13/16    Entered 01/13/16 15:42:40    Desc
Main Document    Page 6 of 15

## II. Factual Findings

From the date the petition was filed, Debtor has intended to sell its business as a going concern because it has no ability to reorganize.[3] At the initial status conference, Debtor represented that it intended to pursue liquidation and would be consulting with M&T on the selection of a business broker. The first broker appointed by the Court had no success in selling the unique property and in May 2015 a new broker was appointed. MMI operates the flea market that is open to the public on Saturdays and Sundays. MMI collects rents from some of its vendors on a monthly basis under the terms of written leases. Other vendors, however, only pay rent when they reserve spaces at the flea market. This latter group of vendors typically pays rent in cash.

After Debtor filed its petition, it retained as professionals attorney Robert L. Knupp and certified public accountant and business consultant Francis C. Musso ("Musso"). Both professionals indicated that they represented no interest adverse to Debtor.

MMI operates the flea market under the terms of a lease between MMI as tenant and Debtor as landlord. Lentz executed the lease on behalf of both MMI and Debtor. Under the terms of the lease, MMI is obligated to pay Debtor an annual rental equal to the real estate taxes assessed against the Property and the amount of the principal and interest payments for the PNC and M&T mortgages. Debtor has no source of income other than the payments made under the terms of the lease. At the hearing on the within motion, the property manager testified that the PNC mortgage payments for October and November 2015 were not paid by MMI to Debtor under the lease. She further estimated that MMI failed to pay approximately $80,000 in real

---

[3]Debtor's Chapter 11 case was adversely impacted by a fire at the flea market in September 2015. Even if the fire had not occurred, Debtor would not have been able to reorganize.

7

property taxes in 2015. M&T has not been paid the full monthly mortgage amount since the petition was filed.

After she assumed control of the MMI accounts in November 2015 and reviewed the accounts and records, the property manager discovered that approximately $3700 in rents had been entered in MMI's accounting records, but had not been deposited in the bank account. She further instituted a process for issuing receipts when vendors paid rent in cash, a practice that previously had not been followed. She also discovered a significant amount of unopened mail. Some of the items included checks that had not been deposited and were stale. She also collected $8000 in back rent that had not been paid.

The property manager testified that before she assumed control of MMI's accounts, Lentz disbursed to himself, in addition to $16,495.26 in compensation, three checks totaling $17,250 in October and November 2015. During the same period, Lentz paid accrued fees of $12,500 to Musso. These payments were not authorized under the budgets for the June 2 and November 6 cash collateral orders.

### III. DISCUSSION

*A. Presumption that Chapter 11 debtor remains in possession.*

Under Chapter 11 of the Bankruptcy Code, a debtor is generally permitted to remain in control of its assets and operations because existing management is typically best positioned to guide a business through the rehabilitation process. *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 524 (Bankr. E.D.N.Y. 1989) *cited in In re Marvel Entm't Grp., Inc.*, 140 F.3d 463, 471 (3d Cir. 1998). Accordingly, "appointment of a trustee should be the exception, rather than the rule." *In re Sharon Steel Corp.*, 871 F.2d 1217, 1225 (3d Cir. 1989). The party moving for appointment

of a trustee must prove the need for a trustee by clear and convincing evidence. *Marvel Entm't*, 140 F.3d at 471. The decision whether to appoint a trustee is vested in the discretion of the bankruptcy court and is based upon the totality of the circumstances. *Sharon Steel*, 871 F.2d at 1226, 1228.

In exchange for the authority to continue to manage the business affairs of a company, a debtor-in-possession owes fiduciary duties to its creditors and the estate. *Marvel Entm't.*, 140 F.3d at 471. These duties include the duty of care to safeguard estate assets, the duty of loyalty and the duty of impartiality. *See* Daniel B. Bogart, *Liability of Directors of Chapter 11 Debtors in Possession: "Don't Look Back – Something May be Gaining on You,"* 68 Am. Bankr. L.J. 155, 216-27 (1994) *cited in In re Bowman*, 181 B.R. 836, 843 (Bankr. D. Md. 1995). The duty of loyalty requires the avoidance of self dealing and conflicts of interest. *Id*. The rights of a debtor in possession, however, are not absolute and may be forfeited if these fiduciary duties are neglected. *See In re Eurospark Indus., Inc.*, 424 B.R. 621, 627 (Bankr. E.D.N.Y. 2010) (citing cases).

>    B. *Circumstances that support appointment of Chapter 11 trustee.*

Section 1104(a) of the Bankruptcy Code provides that a trustee shall be appointed:

>    (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause . . . ;
>
>    (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate . . . .

11 U.S.C. § 1104(a). Appointment of a trustee is mandatory if cause is found, but a bankruptcy court has wide discretion to determine whether specific conduct establishes cause. *In re Sundale*,

9

*Ltd.*, 400 B.R. 890, 900 (Bankr. S.D. Fla. 2009) (citing cases). Whether "cause" exists for appointment of a trustee is not limited to the enumerated grounds set forth in § 1104(a), but extends to other occurrences. Factors that have been considered include: debtor's dealings with insiders; the unwillingness or inability of management to pursue claims or causes of action; and conflicts of interest. *In re Intercat, Inc.*, 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000). When a debtor's management has multiple roles, conflicts of interest often arise. *See, e.g., Marvel Entm't,* 140 F.3d at 474 (holding that animosity between debtor and lenders created lack of confidence in debtor's management); *In re Taub*, 427 B.R. 208, 227-28 (Bankr. E.D.N.Y. 2010) *aff'd*, No. 08 BK 44210 ESS, 2011 WL 1322390 (E.D.N.Y. Mar. 31, 2011) (finding that acrimonious relationship between debtor and estranged spouse and other family members who held claims against the estate supported appointment of trustee); *In re SunCruz Casinos, LLC,* 298 B.R. 821, 831 (Bankr. S.D. Fla. 2003) (finding conflict of interest where creditor and debtor-in-possession held landlord-tenant relationship).

When a trustee is appointed "in the interests of creditors," however, it is not necessary to find that a debtor-in-possession or management has engaged in any misdeeds. *Sharon Steel*, 871 F.2d at 1226. When deciding whether a trustee should be appointed under § 1104(a)(2) a court will consider: (1) debtor's trustworthiness; (2) past and present performance and the potential for reorganization; (3) whether creditors have confidence in present management; (4) and the benefits of appointing trustee balanced against the cost of appointment. *Eurospark Indus.*, 424 B.R. at 621 (citing *In re Inosphere Clubs, Inc.*, 113 B.R. 164, 168 (Bankr. S.D.N.Y. 1990)).

In addition to the provisions of § 1104, a trustee shall be appointed if grounds exist to convert or dismiss a Chapter 11 case, but the court determines that the appointment of a trustee is

10

in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). Sixteen specified grounds for conversion or dismissal of a case are set forth in § 1112(b)(4) including: "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation"; "unauthorized use of cash collateral substantially harmful to 1 or more creditors"; "failure to comply with an order of the court"; and "failure timely to pay taxes owed after the date of the order for relief. . . ." 11 U.S.C. § 1112(b)(4)(A), (D), (E), and (I).

      C.      *Does "cause" exist for appointment of a trustee?*

M&T asserts that appointment of a trustee is mandated by § 1104(a)(1) and would be in the best interests of creditors under § 1104(a)(2). In support of its motion for appointment of a trustee under § 1104(a)(1), M&T states that Debtor has been grossly mismanaged. As an example of this mismanagement, M&T asserts that Debtor made payments to Lentz and Musso rather than paying real estate taxes and M&T, which violated the terms of the cash collateral orders. Further, M&T insists that Debtor's professionals and principal have an actual conflict with Debtor's interests because they also have represented the interests of MMI, Debtor's tenant. MMI has failed to pay the required rent to Debtor under the terms of the lease and no action has been taken by Debtor's management to enforce the lease. Finally, M&T asserts that after almost two years in Chapter 11, Debtor has been unable to sell its assets along with those of its affiliates as a going concern.

"The factors used to determine gross mismanagement vary depending on the facts of the case, but often include elements that hint at fraud, in addition to negligence." *In re Microwave Prod., of Am., Inc.*, 102 B.R. 666, 676 (Bankr. W.D. Tenn. 1989). M&T has failed to show by clear and convincing evidence "cause" for the appointment of a trustee under this standard.

11

From the inception of this case all parties recognized that Debtor was not viable as a going concern and that Debtor's assets would have to be sold along with those of the operating affiliate. Debtor's primary secured creditors, M&T and PNC, are well aware that Debtor's only significant business is its lease with MMI and that if MMI failed to generate sufficient income to make the lease payments, there would be no other source of income. M&T has suggested that Debtor should have terminated the lease with MMI, but neither M&T nor PNC enforced their rights to obtain payment from MMI and acquiesced in Debtor's approach to marketing Debtor's assets with those of MMI. No party objected to Debtor assuming the Solar and MMI leases.[4] While it was inappropriate for MMI to pay its professionals and Lentz rather than first remitting the amounts due on the lease with Debtor so that Debtor had the income necessary to pay the mortgage payments, I do not find these actions sufficient to constitute cause for the appointment of a trustee under § 1104(a)(1). When the case was filed, creditors accepted Debtor's argument that the synergies created by MMI continuing to operate on the Property would enhance the value of the asset. Only after the hope of selling the Property at the listed price dimmed, did creditors begin to notice the inherent conflicts present in the existing arrangement.

    D.    *Would the appointment of a trustee be in the best interest of creditors and other interests of the estate?*

"Unlike subsection (a)(1), § 1104(a)(2) may well entail the exercise of a spectrum of discretionary powers and equitable considerations, including a cost-benefit analysis, to determine

---

[4] At the hearing, M&T criticized Debtor for not terminating the MMI lease and obtaining another tenant. I question whether Debtor could have readily obtained another party to operate a flea market on the Property, and no evidence was offered that any other party was interested in leasing the Property for any purpose.

whether the appointment of a . . . trustee would be in the interests of creditors, equity security holders and other interests of the estate." *V. Savino*, 99 B.R. at 525.

A court is more likely to appoint a trustee under § 1104(a)(2) when reorganization is not possible, and a Debtor's principal may be motivated to protect his own interests rather than the interests of creditors. *See Eurospark*, 424 B.R. at 628-33. When coupled with a lack of confidence in management, and the benefits of appointing a trustee outweigh the cost, courts often find the argument for appointment of a trustee to be compelling. *See*, *also*, *In re Patman Drilling Int'l, Inc.,* No. 07-34622, 2008 WL 724086, at *6 (N.D. Tex. Mar. 14, 2008) (holding that trustee appointment was appropriate because of management's conflicts of interest, and creditors' lack of confidence)*; In re The 1031 Tax Group, LLC*, 374 B.R. 78, 91 (Bankr. S.D. N.Y. 2007) (holding that "well-founded distrust and a lack of confidence" in a debtor without more supports appointment of a Chapter 11 trustee); *In re Euro-Am. Lodging, Corp*., 365 B.R. 421, 432 (Bankr. S.D. N.Y. 2007) (holding that lack of confidence in management and the greater likelihood that a planned sale will be consummated with a trustee justifies appointment). Lack of confidence must be more than a personal dislike for management and should relate to the objectives of the case.

In this case, creditors' frustration with the lack of a successful resolution to the case after almost two years is understandable. The Property was marketed for a year at the same asking price and received no offers. Only recently, did the second real property broker reduce the price. And, most troubling, on the eve of the hearing on the motion to appoint a trustee Debtor filed a motion to sell the Property and the assets of MMI without obtaining prior approval of bidding procedures and for a greatly reduced price.

13

M&T asserted at the hearing that considering the unpaid accrued expenses of Debtor's professionals, it was prepared to bear the cost of the trustee. With this representation in mind, I find that it would be in the interest of creditors and other interests of the estate for a trustee to be appointed under § 1104(a)(2).

E.   *Other factors supporting the appointment of a trustee.*

No party has filed a motion to convert or dismiss this case under 11 U.S.C. § 1112(b)(4). But several grounds exist that support conversion or dismissal. Evidence introduced at the hearing demonstrated that there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation." Debtor has accrued unpaid administrative expenses and never has intended to rehabilitate its affairs. The use of cash collateral has been terminated, therefore any continued use will be "substantially harmful to 1 or more creditors." Debtor failed to comply with the terms of several cash collateral orders and has failed to pay all taxes owed after the petition was filed. Because the appointment of a Chapter 11 trustee is an alternative to conversion or dismissal that a court may consider, these factors also support the appointment of a trustee.

### IV. Conclusion

Having examined the evidence presented at the hearing and the documents of record in this case, and based upon a consideration of the totality of the circumstances, I find that it would

be in the interest of creditors, equity holders, and other interests of the estate to appoint a Chapter

directed to appoint a Chapter 11 trustee. An appropriate order will be entered.

**By the Court,**

_____
Chief Bankruptcy Judge

Date: January 13, 2016